Royalton Stone Corporation, et al. [1] v. Commissioner. Royalton Stone Corp. v. Commissioner
Docket Nos. 916-63 - 919-63, 3459-63 - 3461-63. 1966-109.
United States Tax Court
T.C. Memo 1966-109; 1966 Tax Ct. Memo LEXIS 175; 25 T.C.M. (CCH) 570; T.C.M. (RIA) 66109; 24 Oil & Gas Rep. 691; May 25, 1966
*175 Petitioners A and B owned 3 tracts of land containing undeveloped deposits of stone. They made separate agreements with corporations C and D, which they wholly owned, to quarry and remove the stone. The corporations are to make payments each year at the rate of 20 cents for each ton of materials quarried and removed. The contracts did not fix any total, or maximum, or minimum dollar amount to be paid; or any quantity of materials to be removed, or any period of time for the operations. A and B retained title to the tracts during quarrying operations. Upon the record and the particular contracts under review, held: (1) The contracts did not effect a sale of each tract of land or a sale of the deposits of stone and materials in place. (2) A and B retained an economic interest in the stone and materials. (3) The payments received by A and B from the corporations are taxable as ordinary income subject to depletion. Albert R. Mugel, Liberty Bank Bldg., Buffalo, N. Y., for the petitioners. Edward M. Hance, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in income tax for the years 1958-1961, inclusive, as follows: *176 Docket
Defi-
No.
Petitioner
Year
ciency
917-63
James Switzer
1958
$23,758.98
917-63
1959
15,829.95
3460-63
1960
29,829.10
3460-63
1961
$21,806.00
918-63
H. G. O'Connor
1958
26,065.52
918-63
1959
20,194.61
3461-63
1960
39,967.05
3461-63
1961
22,831.73
916-63
Royalton Stone
6/30/58
6,835.03
916-63
6/30/59
1,448.76
3459-63
6/30/60
1,804.45
919-63
Frontier Stone
11/30/59
26,152.94 The individual petitioners acquired 3 tracts of land containing mineral deposits of stone, limestone, and related materials. They own all of the stock of the corporate petitioners which are engaged in the businesses of quarrying and selling stone. The individuals executed 3 agreements relating to each tract under which either Frontier or Royalton quarried and removed stone. The individuals received payments based on 20 cents for each ton of materials removed. The main question is whether the payments are entitled to capital gain treatment, or are taxable as ordinary income. Findings of Fact The stipulated facts are so found; the several stipulations of facts are incorporated herein by reference. James M. Switzer and his wife are residents of Lockport, New York. Holman O'Connor and his wife are residents of Ransomville, New York. Frontier Stone Products, *177 Inc. and Royalton Stone Corporation are New York corporations, each having its place of business in Lockport, New York. The individual petitioners filed joint returns on the calendar year basis. The corporate petitioners filed returns on a fiscal year basis. All of the returns were filed with the district director of internal revenue at Buffalo, New York. Frontier was organized on February 9, 1945. It keeps its books and prepares its tax returns under an accrual method of accounting on the basis of a fiscal year ending on November 30. Royalton was organized on June 15, 1955. It keeps its books and prepares its returns under an accrual method of accounting on the basis of a fiscal year ending on June 30. Each corporation is engaged in the same kind of business, which consists of quarrying stone, and crushing, screening, and selling the crushed stone. Each corporation sells crushed stone for use in road building, for ready-mix concrete, and for other uses. O'Connor is the president of Frontier and the vice president of Royalton. Switzer is the president of Royalton, the vice president of Frontier, and the general manager of production for both corporations. During the taxable years O'Connor *178 and Switzer owned all of the common stock of Frontier and Royalton, 50 percent each. O'Connor is a certified public accountant. He has maintained an office in Lockport, New York since 1945, where he conducts his accounting business. He also is engaged in the business of operating a large dairy farm in Ransomville, New York. During the taxable years, he was employed by and devoted part of his time to the businesses of the following corporations; Frontier Stone Products, Inc.; Royalton Stone Corporation; and Frontier Dolomite Concrete Products Corporation. Each paid him a salary. Switzer is employed by each of the above corporations and receives a salary from each one. Frontier Dolomite manufactures concrete pipes, blocks, and prestressed concrete. It purchases crushed stone for the making of its products from Frontier and Royalton. O'Connor and Switzer own 90 percent of the stock of Frontier Dolomite. The products produced and sold by Frontier Stone and Royalton include agricultural limestone (ground to a powder); asphaltic concrete (blacktop made of asphalt and crushed stone); crushed stone for the construction of roads; and related products. The gross sales of Frontier Stone in *179 its fiscal year ended November 30, 1959, were in excess of $2,000,000. Royalton's gross sales in the fiscal years ending June 30, 1958 and 1959, amounted to in excess of $300,000, for each year. The history of Frontier Stone is as follows: It was organized in 1945 and was owned by the Wurtzburgers. O'Connor was its accountant. The Wurtzburgers, on October 15, 1954, sold the stock of Frontier to O'Connor and Stephen Elggren, and a 53-acre tract of land in Lockport, which they owned themselves. In October 1954, Frontier, itself, owned some land where it carried on quarrying operations. That land is adjacent to the tract of 53 acres. O'Connor and Elggren paid $100,000, in equal amounts, for the 53 acres, and each acquired 50 percent of the shares of Frontier Stone's stock. On October 1, 1956, Switzer purchased Elggren's 50 percent interest in the 53-acre tract of land for $50,000. He also acquired Elggren's 50 percent of the stock in Frontier Products. The background of Royalton is as follows: At some time prior to 1955, Colorado Fule and Iron Corporation acquired a stone quarry business from the Wickwire concern consisting of stone quarry land (the Wickwire property), a plant, and *180 the equipment. The Wickwire property had been quarried for 50 years. In 1955, O'Connor, Elggren, and Switzer purchased from Colorado Fuel and Iron all of the Wickwire quarry business, the land, plant, equipment, and inventory; and thereafter they transferred all of the properties so acquired to Royalton Stone Corporation, which they organized on June 15, 1955, in exchange for the stock of Royalton. Prior to April 15, 1957, O'Connor and Switzer acquired Elggren's stock and became the sole stockholders of Royalton. The issue in this case relates to 3 parcels of unimproved real estate acquired and owned by O'Connor and Switzer, as follows: 1. 6 1/2 acres, part of the 53 acres purchased in October 1954 from the Wurtzburgers, located in the City of Lockport. The allocated cost of the 6 1/2 acres is $19,500, of which amount the cost basis of O'Connor and of Switzer, each, is $9,750. 2. 20 acres of land, in the City of Lockport, which was purchased on December 11, 1958, from the Niagara Abrasives Company for $15,300, which cost was borne equally by O'Connor and Switzer. 3. 20 acres of land in the town of Royalton which was purchased on July 9, 1956, from the Coulsons, for $16,000, which cost *181 was borne equally by O'Connor and Switzer. The Coulson land is adjacent to the Wickwire land. Each parcel of real estate contained deposits of stone, gravel, and sand. The 6 1/2 acres of the Wurtzburger property was adjacent to property being quarried by Frontier Stone. The 20 acres purchased from Niagara Abrasives Company is adjacent to the property purchased from the Wurtzburgers. O'Connor and Switzer entered into 3 separate agreements, each one having identical terms and provisions, each relating to one of the parcels of land described above. The first agreement was executed with Frontier Stone on April 15, 1957, and it relates to the 6 1/2 acres of land in Lockport. The second agreement was executed with Frontier Stone on June 26, 1959, and it relates to the 20 acres of land in Lockport. The third agreement was executed on April 15, 1957, with Royalton Stone, and it relates to the 20 acres of land in the town of Royalton. The following are the material terms and provisions of the agreement with Frontier Stone executed on April 15, 1957: * * *
1. The parties of the first part [O'Connor and Switzer] agree to sell, and the party of the second part [Frontier] agrees to purchase the *182 premises situate in the City of Lockport, in the County of Niagara and State of New York, particularly described in a certain deed dated the 1st day of October, 1956, duly recorded in the Office of the Clerk of the County of Niagara, as follows: ALL THAT TRACT OR PARCEL OF LAND situate in the City of Lockport, County of Niagara and State of New York, being part of Lot Number Sixty-nine (69), in the Fourteenth Township of the Seventh Range of the Holland Land Company's land (so called) and bounded as follows: South by a line parallel with the south line of said lot at the distance of ten (10) chains and seventy-six (76) links north therefrom twelve (12) chains and fifty (50) links; west by lot number three, five (5) chains and twenty-four (24) links; north by a line parallel with the first mentioned boundary twelve (12) chains, thirty-four and one-half (34 1/2) links, and on the east by a part of said lot sixty-nine, five (5) chains and twenty-four links, containing six and one-half acres, more or less. 2. Said premises are to [sic; to be] conveyed by the parties of the first part by Covenant against Grantor Deed conveying good and marketable title to the premises, free from all encumbrances *183 upon payment of the purchase price to be fixed and paid in the following manner, to-wit: The party of the second part shall enter into immediate possession of the premises hereinabove described for the purpose of quarrying and removing therefrom sand, gravel, stone and other materials useable in its business and shall pay to the parties of the first part, on or before the 31st day of December of each year after date, the sum of twenty cents (20") per ton of materials so quarried and removed during the preceding period. 3. When the party of the second part has completed its quarrying operations on said property and paid on account of the purchase price of the premises, the full sum of twenty cents (20") per ton for materials quarried and removed as hereinabove set forth, the parties of the first part shall thereupon execute and deliver title to the premises in the manner hereinbefore described. 4. The parties of the first part shall pay all taxes and assessments levied against said premises prior to the delivery of the deed and the party of the second part shall indemnify and harmless save the parties of the first part of and from any and all liability, in law and in equity, for loss *184 or damage to any person or property arising out of its operations on the described premises from and after the date hereof. * * *
Frontier Stone carried on quarrying operations on the land covered by each agreement, as did Royalton Stone under its agreement. During the calendar years 1958-1961, Frontier and Royalton, respectively, paid the following total amounts to O'Connor and Switzer: Agreement No. 1, 4/15/57, Frontier
Year
O'Connor
Switzer
Total
1958
$50,928.80
$50,928.80
$101,857.60
1959
33,193.10
33,193.10
66,386.20
Total
$84,121.90
$84,121.90
$168,243.80
Agreement No. 2, 6/27/59, Frontier
1960
$54,608.30
$54,608.30
$109,216.60
1961
44,651.12
44,651.12
89,302.24
Total
$99,259.42
$99,259.42
$198,518.84
Agreement No. 3, 4/15/57, Royalton
1958
$10,699.10
$10,699.10
$ 21,398.20
1959
9,725.76
9,725.76
19,451.52
1960
18,819.11
18,819.11
37,638.22
1961
12,163.54
12,163.54
24,327.08
Total
$51,407.51
$51,407.51
$102,815.02
The total amount paid by Frontier and Royalton to O'Connor and Switzer during the 4 years 1958-1961 was $469,577.66: Agreement No. 1, Fron-
tier
$168,243.80
Agreement No. 2, Fron-
tier
198,518.84
$366,762.64
Agreement No. 3, Royal-
ton
102,815.02
102,815.02
$469,577.66
$469,577.66
O'Connor and Switzer, each, received the following *185 total amount in the taxable years from Frontier and Royalton, or $234,788.83, each: Each
Both
1958
$ 61,627.90
$123,255.80
1959
42,918.86
85,837.72
1960
73,427.41
146,854.82
1961
56,814.66
113,629.32
Total
$234,788.83
$469,577.66
The following schedule sets forth the total amount paid to both O'Connor and Switzer by Frontier during its fiscal years ending in 1958 and 1959, and by Royalton during its fiscal years ending in the 4 years 1958-1961: Frontier
Fiscal Year
Amount
11/30/58
$101,857.60
11/30/59
50,039.80
Total
$151,897.40
Royalton
6/30/58
$ 35,647.60
6/30/59
25,276.96
6/30/60
21,729.38
6/30/61
33,729.02
Total
$116,382.96
Each individual petitioner treated the payments made by Frontier and Royalton as capital gains in his tax return, allocating the payments to his cost basis of the real property from which stone and other materials were removed. The allocation to cost was based on the taxpayer's estimate of the number of acres quarried. O'Connor and Switzer, each, made an allocation of his cost basis of the 6 1/2 acres of land (Agreement No. 1) in the amount of $4,500 in 1958, and $3,000 in 1959, which amounts were off-set, respectively, against the payments received by him from Frontier in 1958 and 1959. With *186 respect to the 20 acres of land covered by Agreement No. 2 with Frontier, each individual allocated $4,875 and $4,000 of his cost basis, respectively, to the payments received from Frontier in 1960 and 1961. With respect to Agreement No. 3 with Royalton, each made the following allocations of his cost basis of the 20 acres of land covered by that agreement to the payments received from Royalton; $1,500 in 1958; $1,250 in 1959; $2,500 in 1960, and $1,666.67 in 1961. The respondent made the following determinations about the amounts received by each of the individual petitioners from the corporation: That the amounts received in each year from Frontier and Royalton in fact are royalty income under section 61, rather than proceeds from the sale of a capital asset subject to capital gains treatment under section 1202. He removed from the income of each year the amount reported as capital gain. Respondent included the following amounts in the taxable income of O'Connor and Switzer, respectively, and eliminated the following capital gain reported by each individual: Royalties
Added to
Capital Gain
Income
Eliminated
Year
Amount
Amount
1958
$61,627.90
$27,813.95
1959
42,918.86
19,334.43
1960
73,427.41 *
33,026.21 *
1961
56,814.66
25,573.99
*187 Respondent determined that Frontier, for its fiscal year ended November 30, 1958, (which is not before us) was entitled to a royalty expense deduction of $101,857.60, but was not entitled to a depletion deduction of $85,734.45; and that for its fiscal year ended November 30, 1959, it was entitled to a royalty expense deduction of $50,039.80, but was not entitled to a depletion deduction of $100,333.93. Respondent determined that Royalton, for its fiscal years ended June 30, 1958, 1959, 1960, and 1961, was entitled to the following royalty expense deductions, but not to the following depletion deductions: Fiscal
Royalty Expense
Depletion
Year
Deductions
Disallowed
1958
$35,647.60
$47,291.89
1959
25,276.96
26,563.04
1960
21,729.38
23,699.46
1961
33,729.02
33,729.02 He gave the following reasons for his determinations: Royalty expenses are allowed as deductible expenses to the extent of 20 cents per ton of materials quarried and removed from the quarries; the deductions claimed for depletion are disallowed since the corporation is not the owner of an economic interest in the stone quarries. *188 In the cases of O'Connor and Switzer, respondent also determined that each was entitled to an annual depletion deduction under section 611, because each held an "economic interest in mineral deposits" in the 3 tracts of land covered by the agreements with Royalton and Frontier, in the following amounts: Depletion
Year
Allowed to Each
1958
$3,081.40
1959
2,145.94
1960
3,671.37
1961
2,840.73
When O'Connor and his associates purchased the stock of Frontier Stone in October 1954, Frontier was carrying on quarrying operations on land that it owned, but this land was becoming exhausted and Frontier needed an additional source of materials. The 53-acre tract of land that O'Connor and his associates purchased in their own names in October 1954 from the Wurtzburgers, individually, is adjacent to one of the quarrying sites owned and operated by Frontier, as is the 6 1/2 acres of the 53-acre tract, covered by agreement No. 1 with Frontier. It is stipulated that Frontier had entered upon the 6 1/2 acre area and was carrying on quarrying operations there prior to April 15, 1957. It is stipulated that Royalton entered upon and performed quarrying operations on the Coulson property prior to April 15, 1957, *189 which is the property covered by the agreement with Royalton. The land on which Royalton also carried on quarrying operations (acquired from Colorado Fuel and Iron) was becoming exhausted in 1957. The operations of Frontier Stone, Frontier Dolomite, and Royalton Stone are integrated operations. The petitioners did not and do not purchase any stone from outside sources for the use of each corporation in the conduct of its business. If all of the stone were to be extracted from a tract, there probably would be extensive pits in the land which would reduce the value of the land to little or no value. The pits might become filled with water; if not, the main use of the land would be for the dumping of refuse. Each tract of land was put to use in the business of Frontier and Royalton, respectively, within a short time after it was acquired by the petitioners. The 6 1/2 acres was made available to Frontier 6 months after October 1, 1956, when Switzer acquired the interest of Elggren; the Coulson land was made available to Royalton 9 months after the purchase thereof on July 9, 1956; and the Niagara Abrasives land was made available to Frontier 6 months after the time of the purchase on *190 December 11, 1958. O'Connor and Switzer have not received any moneys from the use or development of each of the tracts of land in issue other than the payments made under each of the agreements with Frontier and Royalton. Each tract of land was acquired by O'Connor and his associate or associates for the purpose of development and exploitation; i.e., for the purpose of Frontier's and Royalton's quarrying and removing the deposits of stone and other materials that were usable in the operations of Frontier and Royalton. Under each agreement, O'Connor and Switzer retained the legal title to the tract of land. They did not obligate themselves to transfer the title thereto by delivery of a deed to Frontier or Royalton at any time prior to such time as the corporation would have completed its quarrying operations. The payments to be made by Frontier or Royalton to the petitioners were based solely upon the specified unit charge of 20 cents per ton. The following schedule shows the costs to O'Connor and Switzer of each tract of land, and the total amounts of the payments received from Frontier and Royalton during the calendar years in issue: Agreement No. 1
Cost of land
$ 19,500.00
Total receipts 1958, 1959
168,243.80
Agreement No. 2
Cost of land
$ 15,300.00
Total receipts 1958, 1959
198,518.84
Agreement No. 3
Cost of land
$ 16,000.00
Total receipts 1958-1961
102,815.02
*191 The total cost to O'Connor and Switzer of the 3 tracts of land was $50,800. The total amount paid to both of them by Frontier and Royalton under the 3 agreements during the years 1958 through 1961 was $469,577.66. Ultimate Findings O'Connor and Switzer, under each of the 3 contracts, did not make a complete and outright sale of the tract of land involved or of all the deposits of stone and materials in place. They retained ownership of an interest in the stone and related materials in place; therefore, they retained an economic interest in the mineral deposits in each tract. The annual payments made by each corporation to the petitioners were royalties for the stone and materials quarried and removed during the year, for which the payment was 20 cents per ton. The payments did not constitute consideration for the purchase of the tract of land or the mineral deposits in place. The payments received by the petitioners are taxable as ordinary income subject to depletion * (computed in accordance with the applicable sections of the 1954 Code); they are not entitled to capital gains treatment. Each corporation is entitled to deductions for royalty expenses and, in addition, deductions *192 for depletion in the amounts stipulated by the parties. Opinion The main question is in the individual petitioners' cases (called the petitioners, for convenience), the determination of which will dispose of the related questions in the corporate petitioners' cases. The petitioners contend that the corporations' payments in each year ($469,577.66 in 4 years) are taxable as capital gains from the sales of 3 tracts of land, rather than as ordinary income. The respondent's contentions are as follows: That the real character of the contracts must be determined, and that the sole purpose of them was the development of stone quarries on the lands for the exploitation of the mineral deposits; that under the contracts petitioners retained an "economic interest" in the mineral deposits, and they did not make an outright and complete sale of each tract or of the mineral deposits in place; that consequently, the corporations' payments constituted royalties on the production of the quarries, not consideration paid in installments for the outright *193 purchase of either the tracts of land or the mineral deposits in place; therefore, the payments are taxable to the petitioners as ordinary income which is subject to an annual percentage depletion allowance. If the main contention of the respondent is approved, the petitioners will recover their capital expenditures for the lands through the depletion allowances; and the corporations will be entitled to royalty expense deductions in each year, and, in addition, each corporation will also be entitled to a depletion allowance in each year in a stipulated amount. [2] On the other hand, if it is held that under each contract the petitioners made an outright and complete sale of their entire interests in the properties, the respondent contends in the alternative that at the time of executing *194 the contracts the petitioners were holding the tracts of land primarily for sale in the ordinary course of business to their controlled corporations and, therefore, the transactions do not qualify as a sale or exchange of a capital asset under sections 1221 and 1222 of the 1954 Code, and the payments in issue are taxable as ordinary income. The respondent makes a further alternative contention that if petitioners entered into sales agreements, the contracts were at the most agreements to sell on a continuing basis to the corporations the stone quarried from the lands, rather than outright sales at the time of the execution of each contract, and that in making such continuing sales of stone and raw materials, the individuals carried on a business of selling stone to their corporations and the payments constitute ordinary income. In the event that it is held that the individual petitioners either divested themselves through sales of all of their interests in the mineral properties, or sold properties that were held for sale in the ordinary course of business, the corporations will be entitled to larger depletion allowances each year, the amounts of which also have been stipulated, which *195 differ from the depletion that will be allowable to the corporations if respondent's main contention is approved; and, of course, the corporations will not be entitled to royalty expense deductions. The solution of the main question requires that this Court determine the real nature of each transaction of the individual taxpayers with their wholly owned corporation, in each instance, evidenced by a written instrument, each agreement having the same provisions. One of the agreements has been set forth in the findings. In the many cases involving a similar issue, a rule for the construction of written agreements involving lands and their deposits of minerals has become well established, and is to the following effect: "In construing the contract we may look not only to the language employed, but to the subject matter and the surrounding circumstances, and we may avail ourselves of the same light which the parties possessed at the time the contract was made. * * * [citations omitted]." , affd. ; . The construction of the contract involves determination of its "dominant purpose" and the "essential character" *196 of the activities defined by and performed under the contract. ; . "Of course, we may look beyond the mere phraseology of the agreement and determine its substance." . Cases like this "do not turn upon the use of words alone unless it is abundantly clear that the words used by the parties were chosen with precision and accurately reflect their intention and the 'true substance' of the transaction entered into between them." . "The facts of each transaction must be appraised to determine whether the transferor has made an absolute sale or has retained an economic interest - a capital asset." . The above statements of a rule for construing contracts such as the ones here involved have been considered and applied here. We note also that in , this Court listed the various cases dealing with the problem whether proceeds received by an owner of lands, with respect to the removal therefrom *197 of a mineral deposit or natural resource, may properly be classified as capital gain or ordinary income, observed that a variety of results have been reached, and stated: Although the decisions in some of these cases may appear to be in conflict with one another, we think that, when carefully read, they actually apply the same rule, and it is merely the difference in views with respect to comparatively similar factual situations in the application of that rule that is responsible for the difficulty in attempting to reconcile the cases. The rule seems to be that where there is in fact a sale of the material "in place," the owner has sold part of his real estate and any profit realized thereby is therefore not disqualified from being regarded as capital gain by reason of the form of the transaction. [Citations and footnotes omitted.] On the other hand, where the owner does not part with his entire interest in the deposits until removed or where he does not sell part of his property "in place," but in effect merely enters into a lease for the exploitation of his land reserving a royalty with respect to the materials extracted or otherwise merely makes arrangements with a contractor to *198 sell the materials at a unit price from time to time as they are extracted and removed from the property, the transaction has not been considered as a sale of a portion of the land entitling the owner to the benefit of the capital gains provisions. [Citations omitted.] In considering the main issue in these cases, a general review has been made of all or most of the cases dealing with the problem, and , on which petitioners rely, has been given particular consideration. It should be noted at the outset that this case is distinguishable from several involving the removal of dirt from lands, as well as sand and gravel, because here the contracts involved the quarrying and removal of stone and limestone from the lands and the quarrying operations to be conducted resembled those in the mining of ore from ore deposits. O'Connor testified, in effect, that at the time of executing the contracts the parties did not know the extent or the volume of the "usable" deposits of stone in each tract of land, that they relied largely on the fact that the stone which had been quarried from the respective adjacent tracts of land was all right, and they assumed that there were *199 deposits of usable stone in each tract covered by each contract, but the extent and nature of the stone deposits in the lands involved in the contracts "actually was an uncertain thing." It is also noted, as was pointed out in , that the distinguishing factor in particular cases has been whether the facts established that under an agreement the owner of lands had sold "materials in place", thereby selling part of his real estate, rather than merely making an arrangement to sell materials at a unit price from time to time as they are extracted and removed from the property. The distinction between Dann and Green is as follows: In Dann, the contractor, Lane, needed fill dirt for immediate use in nearby construction projects; the taxpayers had the required material which they were willing to sell; the substance of what was done was that the taxpayers made completed sales to Lane of the soil in place; and the transactions were completed by Lane, who removed all of the usable soil, in about 2 1/2 years, between May 1950 and some time in 1952. But in Green, the evidence showed that the contracts with certain contractors merely established the terms upon which *200 the taxpayers undertook to sell dirt as the contractors removed it, truckload by truckload, from their land, and upon the record in that case it could not be held that the taxpayers, when they executed the agreements, had made a complete and immediate conveyance and sale of dirt "in place". In other words, from a careful reading of the relevant cases we learn that each case involving the type of issue presented here must be decided upon its own particular facts and circumstances. Therefore, the issue in these cases must be determined on this record, to which we now turn. As we view the problem in these cases, it is to determine on this record whether under each contract petitioners made a present, complete, and outright sale of their entire interests in the tract of land involved, or of all of the mineral deposits "in place".[3] *202 This determination must be made for Federal tax purposes, and in order to satisfy the requirements of Federal tax law, as developed by leading cases, the tests to be applied are not those applied in normal transactions and the niceties of local law are not determinative; , supra; ; *201 ; and As was pointed out in , "Even in the case of a technical sale, consummated by passage of title, the seller is deemed to have 'maintained a capital investment or economic interest' in the mineral property transferred if all or part of the price is payable out of the minerals produced or the net proceeds of production. ." It cannot be held, on this record, that petitioners made an outright sale of each tract of land or of all of the stone "in place" in each tract when each contract was executed. In each instance, petitioners had acquired by investment in the land the entire interest in the natural deposits in place, in which they had also had a capital investment. Under each contract with a wholly owned corporation, petitioners retained the fee title to the land, and they secured income (stone payments) from the extraction of the deposits, to which they must look for the return of their capital. Each transaction between petitioners and a corporation was simply an arrangement whereby the corporation was granted the right to extract and remove stone and related materials in return for a royalty of a specified sum per unit of materials taken. The petitioners were to receive money payable solely from production, that is, materials quarried and removed. Each corporation was to make payments for the extracted and removed stone. Under the principles established in the following cases, the *203 arrangements did not constitute a sale of the land or of all of the stone deposits in place within the meaning of the capital gain provisions. ; ; ; ; , affirming a Memorandum Opinion of this Court, certiorari denied ; (D.C.S.D. Iowa, March 17, 1966). Cf. ; and . The contract with each corporation did not in itself effect a sale of the land or the materials in place; it merely established the terms upon which the materials could be extracted and removed. The true test is whether the contract itself resulted in a conveyance of either the land and all interests therein or of the deposits "in place" so that the owner no longer retains any interest in such deposits. . "Where the owner of the land retains an economic interest in the deposits, the transaction is regarded as a lease and the proceeds are taxable as *204 ordinary income, subject * * * to a deduction for depletion". . In each contract here, the following elements are absent: The corporation did not agree to and did not make any cash payment in a fixed or determinable dollar amount. It did not make any payment, and was not obligated to make any payment, not dependent upon or unrelated to the extraction and removal of mineral deposits, i.e., the successful exploitation of the property. It could not sell or dispose of the fee title, or any part thereof, and apply such proceeds as consideration for a purchase of realty or deposits in place, in addition to the unit payments for extracted materials. The corporation was under no "personal" liability to make payment of some fixed or certain amount regardless of and unrelated to the extraction of materials; and in the contract there was no stated security for the agreed unit payments except (impliedly) the stone and materials that were removed. The corporation did not guarantee to petitioners that its stone payments would equal any specified dollar amount. In , it is said that the second part of the *205 test of an economic interest "has been interpreted to mean that the taxpayer must look solely to the extraction of oil or gas [a natural deposit] for a return of his capital". Here, the petitioners looked solely to the extraction of stone for their compensation. Cf. , where the reverse was true. And see, , affirming on this point , where the taxpayers were to be paid on the basis of the materials extracted and derived income solely from exploitation, and it was held that the taxpayers retained an economic interest in the natural deposits, and conveyed to the lessee only a royalty interest; therefore, the amounts received by the taxpayers from the extraction of natural deposits from their lands were taxable as ordinary income. Each contract between petitioners and one of the corporations is brief; the provisions of each contract are simple; and the provisions are lacking in elaboration. We must determine the "dominant purpose" of the contract, and the "essential character" of the activities performed thereunder, and we may look not only to the language employed but also to the surrounding *206 circumstances. It seems to be necessary to deal more specifically with both the provisions of the instant contracts, the operations under them, and circumstances. The following observations are in elaboration of what has been stated above about the contracts in question: Although in each contract the words "agree to sell" the described real property and "agrees to purchase the premises" are employed, the provision for the actual conveyance by convenant deed of the fee title to the property uses the future tense; the "premises are to be conveyed by" the petitioners by deed; and the petitioners at some time in the future are to execute and deliver a deed conveying the fee title. Each contract by its terms is in form an agreement "to sell" and "to purchase", but is not a contract for an outright and immediate sale of the premises. The petitioners retained the fee title to each tract. Cf. , where the agreement provided for an immediate, outright sale and transfer of property rights; and the taxpayer-grantor made an immediate conveyance and transfer to the grantee of all of her rights and interests. In , we said: "The large cash payment to *207 petitioner was received by her in consideration for her conveyance to the grantee in fee of all of her interests in the property conveyed, without any obligation on the part of the grantee to remove from the property any ore at any time." The same cannot be said here. In fact, paragraph 3 of the instant contracts sets forth conditions precedent to the execution and delivery of the deed to the real estate, which are that the corporation must have completed its quarrying operations on said property", and must have paid the full sum of 20 cents per ton for the materials removed. O'Connor's testimony in explanation of the reasons for not making an immediate conveyance by deed of the title to each tract upon execution of each contract is that the petitioners wanted to protect themselves and their estates in case anything happened to either of them while the contracts were in effect. Also, he observed about the future, they believed the arrangement should be one that would enable them to cope with such possibility as a future dealer of either one to sell his interest in the corporation-party to a contract. Transcript, p. 48. In addition, a thoughtful reading of the clause in paragraph 3 *208 of each contract, "when the party of the second part has completed its quarrying operations on said property", must be made. The clause is an indefinite, if not somewhat ambiguous, one. The contract does not fix any period of time for completing quarrying operations, or for limiting the term of the contract. Here, as in , consideration should be given to possible circumstances which might curtail and affect the future conduct of the corporation's business and operations. Thus, if the corporation should go into bankruptcy before removing all of the deposits of stone and materials, there can be no doubt that both the tract of land and the remaining deposits would not have been an asset of the bankrupt, and that in such situation the petitioners would not have been obliged and could not have been required to then make conveyance of the title to the land to the bankrupt. Other events might lead to cessation of the corporation's quarrying operations prior to its removal of all of the deposits, such as the sale of all or part of the stock of the corporation by one or both of the petitioners which would bring about a sale of the business or a change in management. *209 Or, the termination or reduction of the corporation's business might lead to the ending of the extraction of stone before the exhaustion of the deposits. The contracts do not define what shall constitute the completion of quarrying by each corporation. Even if, as O'Connor testified, the intention of the parties when the contracts were executed was that all of the usable deposits would be removed, the terms of each contract do not obligate and require the corporation to extract all of the deposits, and since the petitioners retained the title to the lands, the intervention of the possible contingencies mentioned above could prevent the conveyance of the title to the corporation. These considerations plainly demonstrate that the contracts in these cases did not in themselves result in petitioners' parting with all of their interests in each tract of land, and in their parting with their interests in the deposits of stone prior to removal. They continued to own the stone deposits until extractions and removals were made from time to time by the corporation. If petitioners themselves had extracted stone from their lands and sold it from time to time, without doubt the profit realized *210 would be ordinary income rather than capital gain. The true test is whether each contract in itself resulted in conveyance of either the tract of land and all interests therein, or resulted in conveyance of the deposits "in place" so that the owner no longer retaned any interest in such deposits. See ; . What was the dominant purpose of the contracts? It is clear that the dominant purpose was the extraction and commercial processing of stone for sale to the customers of each corporation for the benefit of the petitioners and the corporation. It is frequently difficult to classify a contract, such as or similar to these contracts, as a mineral lease or an operating agreement. Cf., . Paragraph 2 of each contract provides that the corporation shall immediately enter upon the property for the purpose of quarrying and removing therefrom stone and other usable materials. According to testimony here, this meant that the corporation would remove the overburden, establish access, move equipment onto the property, and do the things necessary in quarrying *211 and removal operations. The corporations were primarily interested in obtaining stone. The corporation's business was the selling of crushed stone, after crushing and grading the stone. Petitioners owned the corporations and knew all about the business of each one. The corporations did not purchase raw material from any outside sources and customarily did not do so. The stone extracted from the lands covered by the contracts was to be sold, and it was not to be "consumed" by each corporation in some project or undertaking, as in the case of a contractor who needs a certain amount of fill dirt, or soil, to build levees and a right of way under a contract. Cf. . Taking into account the general circumstances here and the knowledge of the petitioners at the time they executed the contracts about each corporation's business, it is not determinative in petitioners' favor in these cases that the petitioners were to receive a stipulated price per ton (20 cents) rather than a percentage of the corporations' sales prices to their customers. In substance and reality, what petitioners were to receive from the corporations was a share of what the corporations would *212 realize from their sales of the stone, even though the amounts to be received by petitioners were based upon a charge of 20 cents per ton. Moreover, the amounts to be received by petitioners was dependent upon the extraction and removal of stone by the corporations, since the contracts did not obligate the corporations to pay any fixed dollar sum per year or month, regardless of whether quarrying operations were conducted, or the extent of them, and the contracts did not obligate the corporations to remove any specified quantity of stone and materials per month, quarter, year, or within any fixed period of time. The contracts allowed the corporations simply to quarry and remove stone when and as needed by the corporations in their businesses, and the corporations were to make payments to petitioners on the same basis. ; ; Each corporation agreed to remove materials "usable in its business" (when and as needed); and depending upon the corporation's needs (the needs of its customers), each corporation was at liberty to carry on quarrying and removal operations frequently *213 or seldom, continuously or intermittently, or for a few years or many years, all depending upon the operations of the corporation's business. Furthermore, the total amount of the payment to be received by petitioners from the corporation, in each instance, on or about December 31 of each year depended solely upon the number of tons of materials removed during the preceding months. Taking the above into account, it must be concluded that the contracts were and are essentially operating agreements even though in some respects they resemble leases. The relationship created under the contracts was one "[resembling] a manufacturing business carried on by the use of the soil". ; ; .547. On the record here, we are unable to conclude that the corporations were interested in the ownership of each tract of land or of any interest therein, except the privilege of entering and quarrying upon each tract. O'Connor testified, as set forth in our findings, that the quarrying operations would substantially destroy the surface of the land and leave open pits in the land, and that when *214 all of the deposits are extracted each tract will have little or no market value because the land either will be usable only for the dumping of refuse, or will be of practically no use if the pits become filled with water. Therefore, the future conveyance of the fee title to each tract of land, if and when conveyed, will be of little consequence and advantage to the corporation. (However, the then delivery of the deeds to the corporations, respectively, probably would be advantageous to the petitioners because the water-filled cavities in the lands possibly might constitute attractive nuisances.) It is our conclusion, further, that the payments made and to be made by the corporations, under the contracts, to petitioners were only payments for the stone and materials removed from the lands and for the privilege of using the lands for quarrying, and that they were not payments for property to which the corporations were taking title, in which they had and were acquiring equities. Under all of the circumstances, upon the record here, and under the substance and "essential character" of each contract, it is our conclusion that the provisions for agreeing to "sell" and to "purchase" each *215 tract of land, and for the future conveyance and delivery of a deed of title to each tract were merely the form and not the substance and "dominant purpose" of each contract. See At the termination of each contract, the petitioners' execution and delivery of a deed to each tract to each corporation would be merely a matter of form; each corporation would receive the bare legal title to property then having little or no value. It may be observed, in passing, that the contracts provided that petitioners would pay the taxes and assessments on the tracts during the terms of the contracts. The agreement of each corporation to save harmless the petitioners from all liability for loss or damage arising out of its operations on the premises was and is no more than ordinarily is made by, and required of, any one who occupies and uses the property of another. The petitioners contend that the payments of 20 cents per ton of materials removed constituted payments, in installments, of the "purchase price" of each tract of land, or deferred purchase-price payments. We cannot agree with this contention; there is not a basis in the evidence in support *216 thereof. See . We think that reading each contract as a whole, taking into account the "dominant purpose", the "essential character", of each contract and all of the surrounding circumstances (discussed above), the fixed unit payments were not deferred payments of a "purchase price" of each tract of land, or of all of the mineral deposits therein, but were simply payments for the materials quarried and removed. O'Connor was asked during the trial why a fixed, total dollar amount had not been specified in each contract as the "purchase price" for the tract of land. His answer was vague, evasive, unresponsive and did not provide any relevant or probative information except that he did not know what the production payments of 20 cents per ton would yield under each contract. At little more than 6 or 9 months, as the case was, before each contract was executed, petitioners' cost for each tract was $19,500 (6 1/2 acres), $15,300 (20 acres), and $16,000 (20 acres). Petitioners purchased each tract in arm's-length transactions. On the record here, we cannot agree that petitioners could not have arrived at the fair market value of each tract 6 and *217 9 months later, and could not have made some estimation of the extent of the mineral deposits through boring or drilling tests. In any event, no probative evidence was produced, and on the record here we are unable to find and conclude as a fact that the unit payments of 20 cents per ton of materials quarried and removed were a device or method for deferred payments of a purchase price for the absolute sale of each tract of land and all interests therein. For comparison, see where the transferee paid the transferor-taxpayer $202,500 concurrently with the execution of the agreement, of which $2,500 was paid for the surface rights and $200,000 was paid for iron ore in place or iron ore rights up to and not in excess of 800,000 gross tons of iron ore. Cf. , where the contract provided for the cash payment of a fixed sum upon execution of the contract and additional fixed sums and for the absolute sale of all of the property, including minerals (oil and gas) in place, without the retention by the taxpayer of any interest therein. See, also, To sustain petitioners' contentions would *218 be to place the form of the contracts above their substance and dominant purpose. It is held that under the contracts petitioners did not make an outright sale of each tract of land to the corporations, and that they did not make a sale of all of the mineral deposits "in place"; that they retained the ownership of each tract of land, and ownership of the mineral deposits until materials were removed; and that they retained an economic interest in the mineral deposits prior to the removal by each corporation. It is held, further, that the annual payments by the corporations to the petitioners constituted ordinary income subject to percentage depletion. The payments do not constitute capital gains. If it were necessary to consider respondent's alternative contentions, we would hold that the purpose for which each tract of land was held at the time of executing the contract was primarily for sale to customers in the course of their business. Therefore, the lands would not be capital assets within section 1221, and the gain would be taxable as ordinary income. At the time of the execution of each contract, petitioners were holding the tract of land for the purpose of having either Frontier *219 or Royalton develop stone quarries and exploit the stone deposits; they were not holding the tract for investment purposes. See ; ; and . The substance of each transaction was the development and exploitation of the stone deposits under an arrangement whereby each corporation quarried and removed stone and materials only as they were needed, and made payments on the same basis. The cases on which the petitioners rely have been considered. These proceedings are distinguishable from the cases relied upon; in particular, the following cases are distinguishable: ; ; and In Barker, the taxpayer inherited a tract of 33 acres which was adjacent to 150 acres owned by Steers, which had been extracting sand and gravel from its own tract. Its operations made the Barker property undersirable for residential purposes. Barker offered to sell her property to Steers for $200,000, which Steers thought too high but it eventually made an agreement with Barker to purchase the sand and *220 gravel. It paid $10,000 when executing the agreement and agreed to pay $3,000 quarterly, or $12,000 a year, regardless of the quantity of materials taken, and under the agreement it was not required to remove any amount of sand or gravel, although the quarterly payments of $3,000 would still be due. The term of the agreement was 15 years, with an option to renew. The agreement could be terminated upon notice upon certain conditions. The court held that the agreement was for the sale of sand and gravel for $190,000, to be paid over a period of 15 years ($12,000 per year, plus $10,000), rather than a lease providing for royalties. The limited period of years fixed the amount of the total consideration (to be paid in quarter-annual installments). Regardless of whether Steers took all of the sand and gravel to which it was entitled under the fixed payments, using 6 cents per cubic yard as the measure, Steers was obligated to make the payments. The court said: "While Steers was not obligated to remove the material, it was obligated to pay for it * * *, and it took title to the material in place even if it should elect not to remove it." In the instant cases, Frontier and Royalton, respectively, *221 did not take title to the deposits of stone and materials in place, regardless of whether extracted and removed, or title to each tract of land. Under the contracts here, each corporation was not obligated to pay a fixed or determinable total dollar amount each year; no sum was paid when each contract was executed; and the contracts did not have a fixed term of years within which payments were to be made to petitioners. The factors that were present in the Barker contract are not present here. ; also, is distinguishable. , is distinguishable; see . The Dann case is distinguishable. There, the contractor needed to obtain soil to use in his construction work; the parties intended to and did effect completed sales of all of the usable soil in place within specified areas; the parties intended that all of the soil would be removed within a short period, which was done in 2 1/2 years. Although the issue is decided for the respondent, recomputations must be made under Rule 50. Decisions will be entered under Rule 50. Footnotes
1. The following cases have been consolidated: Docket No. 917-63, James M. Switzer, et ux.; Docket No. 918-63; Holman O'Connor, et ux.; Docket No. 919-63, Frontier Stone Products, Inc.; Docket No. 3459-63, Royalton Stone Corporation; Docket No. 3460-63, James M. Switzer, et ux.; Docket No. 3461-63, Holman O'Connor, et ux.↩
*. Royalty income added to Switzer's taxable income $73,427.71; capital gain removed from Switzer's income $33,026.22.↩
*. By official order of the Tax Court dated Aug. 10, 1966 and signed by Judge Harron, the material from this point to the end of the paragraph was added.↩
2. Although the parties have stipulated the amounts of annual depletion allowances which would be allowed each corporation in the event the determinations of the respondent in the individual taxpayers' cases are sustained, which would be in addition to deductions for royalty payments to the individuals, they have not explained the basis for such depletion allowances, and we are not concerned with them.↩
3. In , a similar problem was stated to be whether the taxpayer had made, at the time of executing the 1951 contract, "an absolute and immediate sale in 1951 of her surface rights and her rights to iron ore in the properties involved", and whether the money received by her was in payment for the surface rights and rights to iron ore, and whether no part of such payments depended upon the possible production of iron ore as advance royalties or otherwise. Upon the record in that case, it was held that there was "a complete and immediate conveyance of all of petitioner's interest in the property involved, i.e., surface rights and rights to iron ore, for a substantial cash payment not dependent upon or related to the successful exploitation of the property by the grantee."